**MICHAEL, Admr.**

**v.**

**WOODSIDE RECEIVING HOSPITAL.**

Court of Claims of Ohio.

No. 92–07830.

Decided May 21, 1996.

*Paige A. Martin,* for plaintiff.

*Betty D. Montgomery,* Attorney General, and *Susan M. Sullivan,* Assistant Attorney General, for defendant.

FRED J. SHOEMAKER, Judge.

On July 31, 1992, plaintiff filed her complaint. On August 31, 1992, the defendant filed its answer. On September 21, 1992, plaintiff notified this court, stating that a connected action, captioned *Virginia Michael v. Constantin Ciobota, M.D., et al.,* was pending in the Mahoning County Common Pleas Court. The within case was stayed pending the outcome of the connected action. On April 14, 1995, plaintiff's counsel notified this court by letter that the connected action was tried to a defendant's jury verdict on February 21, 1995, and the stay order was promptly vacated. On February 12, 1996, this case came on for trial. After the evidence and arguments were completed, the matter was submitted for a written decision.

The court has read all of the submitted depositions and reviewed and evaluated all the evidence. The court finds the following facts have been established by a preponderance of the evidence.

■ The testimony of plaintiff, Virginia Michael, administrator and mother of Roger K. Michael ("Roger"), regarding why she believed it was necessary to have Roger committed to a state institution was credible. The court does not have the benefit of a transcript of this testimony, but it included actions by Roger of not cleaning his room and smelling up the home; poor personal hygiene; failure to take prescribed medication; intentionally breaking glasses; wandering away from home; and placing bottles in the refrigerator in such a manner that they would fall to the floor when the refrigerator door was opened. The primary reason she had Roger committed was that he had struck her. She filed a charge of domestic violence, which resulted in Roger's commitment to defendant Woodside Receiving Hospital ("Woodside").

Roger was born on December 8, 1956. He was thirty-four years of age at the time of his death. He had been diagnosed in 1980 with schizophrenia, chronic undifferentiated type, after his first psychiatric admission to St. Joseph Hospital. He was never able to work or live independently. His intelligence quotient was sixty-four. He was treated as an outpatient by Dr. Lielbriedis, a private psychiatrist. At times he would become a public nuisance by screaming loudly in the yard, sounding car horns, or repeatedly slamming doors. However, he was generally a very introverted and passive person and not considered to be violent. He also was known to wander away from home. On one occasion, he did not return home for approximately one week. He probably wandered away when he had not taken his medication or he was displeased with statements or actions taken by his parents. He was particularly reliant on his mother. When Roger wandered off, he was never violent or dangerous in the community—only a nuisance. He was never adjudicated to be an incompetent.

The narrative summary of Woodside Receiving Hospital, plaintiff's exhibit 1, summarizes Roger's history at Woodside. It indicates that Roger was admitted on August 6, 1990, and voluntarily discharged on November 19, 1990, by order of detention (the retainer from domestic violence had been dismissed). Included in this summary are the following:

"This 33 year-old, white, single, unemployed male was readmitted to this hospital on 8/06/90 as an Order of Detention. The patient was brought by police for an episode of violent behavior at home, also grossly impaired thought process and behavior, unable to provide his own basic needs. The patient has a psychiatric history. He carries a dual diagnosis of schizophrenic disorder, undifferentiated type and mild mental retardation. He had been admitted here two times in the past. Last admission was 5/27/92 to 7/22/92. After that, he had been admitted several times to psychiatric units in Trumbull area for short relapsing episodes. Reportedly, lately, the patient stopped taking his medication and subsequently he gradually deteriorating, becoming hallucinatory, delusional, restless, unable to sleep or provide for own basic needs, and finally, threatening."

The following is contained in the Social Service Reports:

"History: * * * 'Roger is basically a loner.' The patient claims he was in special classes when in school, and that his problems began at about the age of nineteen. He is not involved in the community. He likes playing cards, checkers, and he claims no friends. Per the parents, they noticed that the patient was getting worse as of late, that is he would stack all of his shirts on his bed at night turning on and off his bedroom light, shouting 'who has moved his shirts.' The patient would set salt shakers on the edge of the table, milk on the edge of the shelf in the refrigerator, so if someone were to open the refrigerator door, the item would fall off. Per the mother, the patient never leaves home. The patient yells and screams in the yard. All of the neighbors have alienated themselves from the patient. The patient has never been in the military. The patient makes additional money by mowing the neighbor's grass for about two dollars. He has no gainful work history. [Emphasis supplied.]

Living Circumstances: Prior to admission, the patient resided with his parents at 5399 Lakeview Rd., in Cortland, Ohio, 44410. His return is not welcome. [Emphasis supplied.]

"Financial Status: The patient receives $257.34 per month S.S.I. His mother is his payee.

"Legal Problems: The patient is a police hold for the Trumbull County Sheriff's Department. He is charged with domestic violence, which is a misdemeanor I.

" * * *

"Planning: The plan is to encourage the patient to resolve his legal problems, to comply with meds and aftercare upon discharge, and to accept alternative placement, as suggested by social worker and case manager. [Emphasis supplied.]

"s/Herman Casey, B.A.

"Social Work Department"

Plaintiff stated unequivocally that under no conditions would she permit Roger to return home. As indicated by the exhibits, including the Interdisciplinary Progress Notes, Roger was hoping and begging to return to his home. He begged without success to be allowed to go home for Thanksgiving. For example, the notes contain the following:

"9/6/90 Pt is hoping that parents will change their mind about not letting him return home to live again. Pt asked the meaning of domestic violence. He stated he only touch[ed] his mother lightly * * * [with] open hands. Pt thinks he can return home * * * [without] going back to jail first. Pt has rapid speech. H. Casey, B.A.

" * * *

"10/2/90 speak * * * [with] DBH Operator. Pt. still hoping that parents will change their mind and allow him to return home. H. Casey, B.A."

Woodside is a locked facility and patients usually stay no longer than ninety days. Seventy percent of the patients with Roger's problems are treated and released back into the community within ten days. Roger was considered to be mildly mentally retarded. While at Woodside, Roger was not on "escape precautions." He never tried to run away during this confinement at Woodside. He was given supervised off-grounds privileges and he never made any attempt to escape. On August 13, 1990, seven days after Roger's admission to Woodside, Dr. Ciobota met with Roger's mother and father. The parents never contacted Dr. Ciobota to find out anything about Roger, nor did any of the family thereafter visit or write to Roger.

Roger's schizophrenia and mild retardation problems could be treated, but never cured. He needed someone to help him take his medication. He could function in the community with supervision. Roger's treatment plan was always to return him into the community with some supervision. Dr. Ciobota preferred that Roger be returned to his home. However, when that became impossible because his parents would not agree, Woodside worked very diligently to place Roger in a group home. No one at Woodside ever advised Roger's parents that they intended to place him in a locked state hospital for the rest of his life and Roger's parents never made such a request.

In late October 1990, Roger refused to go to a group home because he wanted to return home with his parents. Since Roger was an adult, not judicially determined to be incompetent, and the detainer had been lifted, Woodside had to respect his wishes. Roger still wanted and expected to return home. He continued to ask whether his parents telephoned. He knew they did not visit him. By this time, he had substantially improved, but he needed supervision. He was still a loner.

However, Roger finally became convinced that he was not welcome at his parents' home. Therefore, on November 19, 1990, he agreed to placement at the Doris Burdman Home ("DBH"), which was the least restricted environment available for Roger. Woodside did not believe he should be released without supervision and his family would not accept him. Dr. Ciobota testified that he believed Roger's mother's rejection of her child, under these circumstances, was abnormal. However, this court has great empathy for both Roger and his parents, and does not necessarily agree with Dr. Ciobota's opinion, although the parents, by both their words and actions, abandoned Roger after having him committed to Woodside. Therefore, they were not notified when Roger was placed in the DBH group home.

In the evening hours, DBH had two employees on duty monitoring the facility. DBH was a treatment facility where residents were expected to participate in chores and programming. DBH's policy was that the client's needs drive the service. They had residents who have a dual diagnosis or a mental illness. The programming focused on the strengths of the residents.

Because Roger was a loner and would not participate in group programming activities, DBH advised Roger that he was going to be placed in a boarding home. Roger did not protest the proposed placement. Roger wandered away from DBH on November 30, 1990, and was found dead of exposure on December 10, 1990.

Plaintiff brought this wrongful death action alleging, in part, that Woodside was negligent for placing Roger in DBH without first notifying his parents. Furthermore, plaintiff claimed that defendant was negligent in placing Roger at DBH.

■ Woodside's discharge policy is set forth in plaintiff's exhibit 4 and reads in part:

"4. SWITCHBOARD PERSONNEL are responsible for notifying the patient's family of the pending discharge. *Families are to be advised that they should not arrive prior to the specified discharge time.* If they arrive early, they will either have to wait until the designated time, or leave and return later. Any

irate family members should be referred to the Medical Director." (Emphasis added.)

The above discharge policy clearly applies *only* to families that are picking up a discharged patient. Plaintiff's family had abandoned Roger, by both their words and deeds. They made it absolutely clear that they did not want any further contact with him. Therefore, there was no reason to notify the parents of Roger's placement at DBH.

In *Brooks v. Ohio Dept. of Mental Health* (Nov. 14, 1995), Franklin App. No. 95API04–505, unreported, 1995 WL 681195, Judge Close wrote at *3 and *4:

"To prove a claim for medical negligence, it must be shown by a 'preponderance of evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances, and that the injury complained of was the direct and proximate result of such doing or failing to do some one or more of such particular things.' *Bruni v. Tatsumi* (1976), 46 Ohio St.2d 127 [75 O.O.2d 184, 346 N.E.2d 673], paragraph one of the syllabus. Further, the recognized standards of practice must be proven by expert testimony. *Id.* at 131–132 [75 O.O.2d at 186–188, 346 N.E.2d at 677–678], and the expert, in order to opine as to the proximate cause of an injury, must testify to the causation in terms of probability. *Stinson v. England* (1994), 69 Ohio St.3d 451 [633 N.E.2d 532].

"While the test in *Bruni* is proper in a medical negligence case, the court in *Littleton v. Good Samaritan Hospital & Health Ctr.* (1988), 39 Ohio St.3d 86 [529 N.E.2d 449], recognized that, because of the unpredictability and uncertainty as to patients' actions upon release from a psychiatric facility, holding psychiatrists to the malpractice standard of ordinary care is too stringent. Therefore, the court in *Littleton* adopted the 'professional judgment rule,' wherein a psychiatrist would not be liable for releasing a patient who subsequently harms someone if, after carefully examining all of the relevant dates, the psychiatrist makes a professional medical judgment that the patient does not pose a danger to others. The court found that '[w]here there are no professional standards, a psychiatrist must exercise good faith judgment based on a thorough evaluation of all relevant factors.' *Id.* at 99 [529 N.E.2d at 460–461]. We believe the holding in *Littleton* can be expanded to include harm to oneself."

Dr. Ciobota's decision to place Roger at DBH rather than in a locked maximum facility was within his professional judgment and was reasonable when based on the totality of the evidence.

Plaintiff has failed to prove by a preponderance of the evidence that the defendant was negligent. Therefore, judgment shall be rendered in favor of defendant on plaintiff's complaint.

*Judgment for defendant.*

FRED J. SHOEMAKER, J., retired, of the Franklin County Court of Common Pleas, sitting by assignment.